2016 IL App (4th) 140440

NO. 4-14-0440

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JASON BRADLEY MANSKEY, | ) | No. 13CF926 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justice Steigmann concurred in the judgment and opinion.
Justice Holder White concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     In a bench trial, the trial court found defendant guilty of both counts of the indictment:  count I, which charged him with failing to complete his registration as a sex offender, and count II, which charged him with giving a false residential address during his (incomplete) registration.  See 730 ILCS 150/3(a) (West 2012).  The court sentenced him to concurrent prison terms of 14 years.  He appeals.

¶ 2     First, he argues that, although the trial court never found a *bona fide* doubt as to his fitness, the court erred by proceeding with the sentencing hearing without having received a report from the expert the court had appointed pursuant to section 104-11(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-11(b) (West 2012)) to determine if a *bona*

*fide* doubt as to defendant's fitness might be raised. We hold this argument to be forfeited, and we are unconvinced that the doctrine of plain error averts the forfeiture.

¶ 3        Second, defendant argues the State failed to prove count II beyond a reasonable doubt. We agree, because the record is devoid of evidence that the address he gave the police was *not* his "place of residence" within the meaning of section 3(a) of the Sex Offender Registration Act (Act) (730 ILCS 150/3(a) (West 2012)). This holding renders moot the remaining arguments that defendant makes regarding count II.

¶ 4        Therefore, we affirm the trial court's judgment in part and reverse it in part: we affirm the conviction on count I, but we reverse the conviction on count II.

¶ 5                                  I. BACKGROUND

¶ 6                                  A. The Indictment

¶ 7        The indictment consisted of two counts, each alleging a violation of section 3(a) of the Act (730 ILCS 150/3(a) (West 2012)).

¶ 8        Count I alleged that defendant "failed to complete his annual registration by [May 24, 2013]."

¶ 9        Count II alleged that, during the period of May 24 through July 15, 2013, he violated section 3(a) in that he "gave false information to the Bloomington police department by saying that he was living at 1212 N. Western Ave[nue], Bloomington, [Illinois,] when he was not living at that address."

¶ 10        In addition, both counts alleged as an aggravating circumstance that, in People v. Manskey, McLean County case No. 2008-CF-1174, defendant previously was convicted of violating the Act and that, consequently, under section 5-4.5-95 of the Unified Code of

Corrections (730 ILCS 5/5-4.5-95 (West 2012)), he should be sentenced as a Class X offender if found guilty in the present case.

¶ 11                              B. The Bench Trial

¶ 12          The trial court held a bench trial on November 15, 2013.

¶ 13          At the beginning of the trial, the parties stipulated that because defendant had been convicted of aggravated criminal sexual abuse in People v. Manskey, McLean County case No. 2002-CF-855, he was required to register as a sex offender.

¶ 14                              1. *The State's Case in Chief*

¶ 15          In its case in chief, the State called the following witnesses, who testified substantially as follows.

¶ 16                              a. Shawn Albert

¶ 17          Shawn Albert was a Bloomington police officer, and one of his assignments was to investigate noncompliance with the registration requirements of the Act.

¶ 18          For residents of Bloomington, such registration was done at the Bloomington police department.   Albert knew defendant as someone who previously was registered in Bloomington and who had an ongoing obligation to register every 90 days.

¶ 19          People's exhibit No. 1 was a registration form, dated April 25, 2013, and signed by defendant, in which he represented (among other things) that his "Resident Address" was 1212 North Western Street, Bloomington.

¶ 20          When defendant came into the police station on April 25, 2013, to register, he provided information, such as his residential address, but he did not bring with him everything that section 3 of the Act (730 ILCS 150/3 (West 2012)) required.   He failed to bring (1) identification showing his current residential address, which, he represented at the time, was

1212 North Western Street (the state-issued identification he brought along showed a previous address); (2) an item of mail addressed to him at 1212 North Western Street, to confirm he lived there; and (3) the annual registration fee of $100.

¶ 21       So, even though defendant came in and answered all the questions, his failure to bring along with him those three things put him, "technically," in noncompliance with the registration requirements of the Act. The practice of the Bloomington police department in such circumstances was to direct the person to come back in 30 days with the missing items (it might take time for mail to arrive at a new place of residence). That is what the Bloomington police told defendant to do. He was to return by May 25, 2013, with those three things.

¶ 22       On May 27, 2013, Albert noticed that defendant had not yet returned to the police station to make good on the registration deficiencies. A few more weeks passed, and Albert went looking for defendant at 1212 North Western Street. The resident there, a man with the last name Mitchell, allowed Albert into the house. Albert "did some sort of a visual inspection to determine whether [defendant] was actually physically present" (we are quoting defense counsel's question, to which Albert answered affirmatively). Albert did not see defendant. Nor did he see any sign that defendant lived there. He testified:

> "I didn't see any items belonging to him, I didn't see a bedroom designated for him, there was no mail scattered about with the address listed as being his. There wasn't a vehicle parked at the resident [*sic*] registered to him. Other indicator, someone might have property related to their person at the home. So, no, I didn't find any of those things there."

¶ 23                                b. Bruce Mitchell

- 4 -

¶ 24 Bruce Mitchell resided at 1212 North Western Street. As of the date of the trial, he had resided there a year.

¶ 25 He recalled that on three separate occasions (he could not remember the dates) police officers came to 1212 North Western Street and asked him if defendant, a friend of his son, Chris Mitchell, "lived there." Bruce Mitchell "did not believe" that on any of those occasions defendant "was *** there," in the house.

¶ 26 On the first occasion when police officers asked Bruce Mitchell if defendant "lived there," he "said no."

¶ 27 Later, police officers returned and asked Bruce Mitchell a second time if defendant "lived there." He gave them the same answer as before: he "said no." Also, during this second visit by the police, he wrote and signed an unsworn statement, dated June 12, 2013, which consisted of a single sentence: "[Defendant] does not live at my house a[t] 1212 N[orth] Western Ave[nue] and has never lived here." Pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2012)) and without objection by defense counsel, the trial court admitted this statement, People's exhibit No. 2, as substantive evidence.

¶ 28 After the admission of People's exhibit No. 2, the prosecutor asked Bruce Mitchell: "Now, on that date, did [defendant] live with you?" (The prosecutor meant June 12, 2013, the date when Bruce Mitchell signed People's exhibit No. 2.) He answered:

"A. I don't know if he lived there or not on that date.

Q. You don't know if he lived with you or not between the

dates of April 25, 2013[,] and July 1st [sic] of 2013?

A. I don't know how to answer this because I don't know if

he ever lived with me. He stayed in the basement.

Q. So during that time frame was he staying in your basement?

A. I have no idea about the time frame.

* * *

Q. And when you say [defendant] would be staying in your basement, how often would he stay there?

A. As often as he wished.  I assume every day.

Q. Did he have a key to your house?

A. Yes, the key was outside on the grill.

Q. Did he receive mail at your house?

A. No.  You know, there might have been something one time to tell you the truth.  I don't know.  I think there was something one time."

¶ 29    On the third occasion when police officers came to 1212 North Western Avenue and asked Bruce Mitchell, yet again, if defendant "lived there," he "pretty much cussed them out and ran them off and then called the police department to complain about them."

¶ 30    On cross-examination, Bruce Mitchell explained that, at his son's request, he had given defendant permission to live in the basement of 1212 North Western Street but that he never really checked to see if defendant had taken him up on the offer.  Bruce Mitchell could not remember the date when his son made that request, but it would have been on the day, or "very close" to the day, when defendant was required to tell the police his residential address.

¶ 31    In view of Bruce Mitchell's testimony that he had given defendant permission to live in the basement, defense counsel expressed bewilderment to Bruce Mitchell as to why he

had previously testified, on direct examination, that he was "not sure whether [defendant] lived there." In response, Bruce Mitchell explained that the basement of 1212 North Western Street was practically a separate unit:

"A. There's an outside, there's a back door that goes to the basement and another door above it that we keep closed. I've had several homeless people live in that basement other times too, and [defendant] needed a place to live. There's a shower down there, TV, computer, he stayed down there. My son would come in from work and shower, do whatever.

Q. Do you know when you provided him a key to the house?

A. At the very same time he was able to get into the home. The keys, it's on the grill right now.

Q. I understand the key is stored somewhere outside for people to use?

A. Yes."

¶ 32    If the basement was an apartment in and of itself, which defendant could have entered and exited whenever he wanted, *via* the external door to the basement, without necessarily encountering or being seen by the residents upstairs, defense counsel wanted to know why Bruce Mitchell had told the police, unequivocally, that defendant had never lived at 1212 North Western Street—as if he had known for sure. Defense counsel asked him:

"Q. *** The first time they came[,] and you said[,] ['N]o, he's not here,['] or ['H]e doesn't live here,['] you don't recall?

A. All they asked me[,] [W]as he there[?] is all I remember them saying.

Q. And at some point they did ask you specifically whether he lived there?

A. The second time they took and asked me if he lived there, I said no. I was trying to get them to quit coming around the house.

Q. Well, in fact, you did fill out and sign what's been submitted as People's [exhibit No.] 2, this written statement where you said he didn't live there, had never lived there?

A. They told me what to write down[,] and I wrote it down and tried to hand it back[,] and they said[,] ['C]ould you please sign it[?'] and I signed it, and I gave it back to them.

Q. As you imagine, the purpose of the trial here is to get at the truth, and you're testifying today that your knowledge about whether [defendant] was in the basement or not at any given time isn't very good?

A. He could have still been living there yesterday.

Q. But you did have an arrangement whereby he would live there and he was given access to the key?

A. Yes.

Q. And it's your testimony today that when you told the officers he never lived there, they actually filled out or told you what to write?

A. Yes.

Q. And that wasn't true? At least as far as you knew, he at some point could have lived there?

A. Yes.

Q. You gave him that privilege?

A. Yes."

¶ 33                                    c. Tom Rena

¶ 34        On July 15, 2013, Tom Rena, a Bloomington police officer, went to a trailer at 305 Firetree Road, Bloomington, looking for defendant. Someone answered the door and told him that defendant had just run out the back door.

¶ 35        Defendant ran into a cornfield and lay flat on the ground, among the foot-high corn stalks. Rena and another police officer arrested him.

¶ 36                        d. Shawn Albert (Recalled to the Stand)

¶ 37        The prosecutor called Albert back to the stand and asked him if he had told Bruce Mitchell what to write in People's exhibit No. 2. Albert answered no. Rather, when Bruce Mitchell told him that defendant did not live at 1212 North Western Street, Albert asked if he would provide a statement to that effect. Bruce Mitchell agreed to do so and wrote the statement.

¶ 38        The State rested.

¶ 39                                *2. Defendant's Case*

¶ 40                        a. Chris Mitchell

¶ 41         Chris Mitchell testified he had known defendant for years, both as a friend and as an employee of himself and his father, Bruce Mitchell. Defendant had been working for Chris Mitchell at Mitchell's Hot Dogs, in Bloomington, as well as for Bruce Mitchell, who was in the business of buying, selling, and rebuilding houses.

¶ 42         Defendant was their live-in laborer. For a brief time, he lived with Chris Mitchell, at his residence on 24th Street, and afterward he lived "for a long time" at Chris's parents' house, 1212 North Western Street.

¶ 43         Defense counsel asked Chris Mitchell:

"Q. And you believe that [defendant] lived there for some period of time?

A. Absolutely.

Q. And how do you know that?

A. I dropped him off and picked him up daily. He would either—yeah, I would either pick him up there or he'd be on the sidewalk or—yeah.

Q. Your father has testified that that house has a basement entrance or it's maybe a garage entrance?

A. Basement.

Q. Basement entrance. And is that how you would access the home?

A. Yeah, unless it's a holiday, I don't go in the front door.

Q. When you dropped off [defendant] or picked him up, was he coming from that, or coming and going through that basement entrance?

A. Yeah, 90 percent of the time there's a set of seats right there, and he'd be sitting there or coming out the door.

Q. You say it's on a daily basis that you would provide transportation for him?

A. Well, a lot of time we'd be working for my dad, so I would show up there and we'd work, or he would come work for me[,] and I'd bring him back. Just depends on what the situation was daily.

Q. And we're specifically referring to the period of time between April 25th of this year and July 12th [*sic*], and during that period of time you believe [defendant] was residing there?

A. I'm sure he was, yeah.

Q. Your father testified that other people have been allowed to live in that basement, is that true?

A. Correct.

Q. And they also were given access by use of a key that was stored outside or kept somewhere?

A. Yeah, we've had many guys over the past that worked for my father and myself.

Q. Is your father kind of a soft touch when it comes to people in need?

A. Well, he's an ordained minister, I'm an ordained minister, my brother is the president of the Christian motorcycle [club]. We do a lot of help."

¶ 44    On cross-examination, the prosecutor asked Chris Mitchell how he could be sure that defendant was living at Bruce Mitchell's residence from April 25 to July 12, 2013; he asked him if "there [was] something that [stood] out for those dates." Chris Mitchell answered:

"A. It was directly after he was not living at my house. It was right after he was done at my home so I knew the time frame. I can't say day by day, but I knew it was directly after that time frame.

Q. When did he live with you?

A. He's stayed at my home a long time. I don't know dates particularly. This has been—I mean, he's always been in and out and lived at my home. I don't know exact dates. I couldn't tell you what I did yesterday.

Q. Did he live with you for the first four months of 2013?

A. I don't know.

Q. Did he live with you in 2012?

A. I would have to look back on records and whatnot.

Q. So you keep records of when people live with you?

A. Of the different jobs that I've done, so I know what people I've used on each job.

Q. So he only lives with you when he's working for you?

A. No, but I would know when the busy season was when he was actually living there full time.

Q. So he only lived with you during the busy season?

A. No, I would have known when he was there because of what we were doing and what work."

¶ 45                                    b. Defendant

¶ 46        Defendant testified that he "bonded out of jail" on April 22 or 23, 2013, and that, the day after, he "started staying" at 1212 North Western Street. He did not have a lease. He did not pay rent. He merely was given permission to stay in the basement. He worked "late nights with Chris," who provided him transportation, and "[a]lmost every night," he returned to the basement after work. He entered the basement through an "outside door."

¶ 47        Defense counsel asked him:

"Q. Do you have some property at that address?

A. Clothing.

Q. Clothing?

A. I don't really own anything else, Mr. McEldowney. I've been incarcerated and in and out of jail. That's pretty much all I have is clothing.

Q. That wasn't my question.  This was during the period of time between April 25th and July 12th, that's when you resided there?

A. Yes.

* * *

Q. Is there a barrier between the basement and the area where Bruce stays?

A. Yeah, the roof of the basement.

Q. Did you go upstairs?

A. Never.  Well, almost never.  There was no reason for me to be in the upstairs.  Everything I needed was—it's almost like it's its own apartment in the basement, there's a shower, there's access to food, a refrigerator.  Upstairs, his wife is upstairs.  It's their house.  It's not just come over and hang out upstairs."

¶ 48        On cross-examination, defendant admitted that, according to the registration form he signed on April 25, 2013 (People's exhibit No. 1), he was supposed to "return by May 25th of 2013, *** to register again."

¶ 49        The defense rested, and the prosecutor stated there would be no surrebuttal.

¶ 50        Counsel then made their closing arguments.  The prosecutor argued that defendant was guilty of count I because he failed to return to the police station on May 25, 2013, after the police told him on April 25, 2013, that he had to do so.  The prosecutor noted that, in addition to quarterly registration, the police could require defendant to come in up to four additional times a year (see 730 ILCS 150/6 (West 2012)); May 25, 2013, was one of those additional times.  As

- 14 -

for count II, the prosecutor argued that defendant was guilty of that count as well because not only did Bruce Mitchell orally tell the police that defendant did not live at 1212 North Western Street but, in People's exhibit No. 2, he told the police that defendant never lived there. "Judge, I think the statement of substantive evidence speaks for itself," the prosecutor said.

¶ 51 Defense counsel then made his closing argument. For purposes of count I, he disputed it was a violation of the Act to lack an identification and $100 in cash. As for count II, he pointed out that Bruce Mitchell, according to his sworn testimony, had given permission for defendant to stay in his basement; Bruce Mitchell just did not know "how often [defendant] was in and out of there because he wouldn't have the ability or the interest to check on that." It was "unfortunate" that, in an effort to stop the police from bothering him, Bruce Mitchell had written a statement that defendant never lived at 1212 North Western Avenue: a statement that was false, since it was "apparent from his testimony that he did not have confirmation about the times that [defendant] was there." Bruce Mitchell's admitted "dishonesty with the police," however, was "not evidence of the defendant's guilt," and defense counsel argued the court should believe Bruce Mitchell's sworn testimony over his unsworn statement in People's exhibit No. 2.

¶ 52 After hearing these arguments, the trial court found count I of the indictment to be proved beyond a reasonable doubt. The testimony relevant to that count was basically as follows. Because defendant's identification showed a previous address instead of 1212 North Western Street—the address at which, according to his representation to the police, he currently resided—he was told to return to the police station within 30 days with proof that he resided at 1212 North Western Avenue. He did not do so. Thus, the court concluded, he had failed to complete his registration.

¶ 53 As for count II, which alleged that defendant had made a false representation in the registration form by representing that he lived at 1212 North Western Avenue, the trial court found that count likewise to be proved beyond a reasonable doubt. Under section 115-10.1 (725 ILCS 5/115-10.1 (West 2012)), People's exhibit No. 1 was substantive evidence that, as of June 12, 2013, defendant had never lived at 1212 North Western Avenue. In his testimony, Bruce Mitchell was unable to say that defendant had, in fact, lived there; he could say only that he did not know, one way or the other, whether defendant had lived there. The court continued: "The other Mr. Mitchell who testified indicated he believed the defendant lived there because he would pick him up there and drop him off there, but he doesn't remember when. So there's really no affirmative evidence other than the defendant's own self-serving testimony that he lived there during the time period in question ***. Bottom line is I don't believe he lived there, and I believe he gave false information when he said he did."

¶ 54                                  C. The Posttrial Motion

¶ 55 On December 18, 2013, defendant filed, *pro se*, a posttrial motion.

¶ 56 On February 20, 2014, he followed up with a letter to the trial court.

¶ 57 Defense counsel filed no posttrial motion.

¶ 58                    D. Defense Counsel's Motion To Appoint an Expert
                          To Evaluate Defendant's Fitness for Sentencing

¶ 59 According to the presentence investigation report, defendant, born on April 14, 1972, was admitted to Mercy Hospital in Urbana, Illinois, on September 26, 1986, when he was 14. He was diagnosed with " 'atypical bipolar disorder and probable conduct disorder' " and remained hospitalized for two weeks. He was medicated with lithium and Ativan. Defendant told the probation officer writing the report that he still "suffer[ed] from manic depression and bipolar disorder."

¶ 60    Defendant also reported using cannabis every day.  Since 2009, however, he rarely drank alcohol, and he stopped using lysergic acid diethylamide (LSD) in 2001.

¶ 61    In August 2009, as a condition of bond, a trial court ordered him to undergo an alcohol and substance abuse evaluation.  In September 2009, Chestnut Health Systems, in Bloomington, found he met the criteria for cannabis dependence and recommended "Level II Intensive Outpatient Treatment."  Defendant failed to follow that recommendation, and consequently he was arrested and was returned to custody.

¶ 62    On December 27, 2013, after reading this background in the presentence investigation report, defense counsel in this case moved that the trial court appoint Dr. Terry Killian to evaluate defendant's fitness to be sentenced.  The stated reason for this request was that defendant was taking no medication for the bipolar disorder mentioned in the presentence investigation report and "[g]iven the Defendant's untreated mental illness, he may currently be unfit to be sentenced" (to quote defense counsel's motion).

¶ 63    That same day, the trial court appointed Killian to perform the requested evaluation, at the county's expense, and "directed [him] to file a report with the Court detailing his findings."

¶ 64    No report by Killian ever was filed.  The record does not explain why.  After the trial court's order appointing Killian, the record never again mentions Killian or his anticipated report.

¶ 65        E. Denial of the Posttrial Motion, Followed by Sentencing

¶ 66    On February 26, 2014, the trial court called the case for a sentencing hearing. Before taking up the question of sentencing, however, the court noted that defendant had filed, *pro se*, a posttrial motion.  The court asked defense counsel whether he "wanted to adopt that

motion \*\*\* and argue it today, or whether [he] wanted [the trial court] to show it stricken pursuant to local rules." After reviewing the *pro se* motion there in the courtroom, defense counsel argued one of its grounds, namely, that the evidence was insufficient to support the conviction of count II, given that, in the trial, Bruce Mitchell recanted the written statement he had made to the police.

¶ 67 The trial court responded:

"That argument was made at trial. There was certainly some vacillation by the witness as to what the officers claimed he said to them and the written statement that he had authored. There was some explanation that or some suggestion at least that that was somehow coerced. The court has certainly considered all of that and did consider that at the trial itself, and the court believes that the evidence that was presented and relied upon by the court does certainly contain sufficient information to prove the charges beyond a reasonable doubt despite the witness'[s] attempts to kind of backtrack from his earlier statements to the police that the defendant did not and never did live in his residence. So, for that reason, the post-trial motion will be denied, and we will then proceed with the sentencing, if both parties are ready."

¶ 68 After hearing testimony, recommendations by counsel, and a statement in allocution by defendant, and after reviewing the presentence investigation report, which showed eight prior felony convictions, the trial court sentenced defendant to concurrent terms of 17 years' imprisonment on counts I and II of the indictment.

¶ 69                    F. A Reduction of the Prison Terms by Three Years

¶ 70          On March 13, 2014, defense counsel moved to reduce the sentences. The only argument the motion made was that the sentences were excessive.

¶ 71          On April 30, 2014, the trial court granted the motion to the extent of a three-year reduction of the prison terms. The court entered an amended sentencing order, which sentenced defendant to concurrent terms of 14 years' imprisonment on counts I and II.

¶ 72                                    II. ANALYSIS

¶ 73                        A. By Holding Further Proceedings
                          Despite the Lack of a Report by Killian,
                          Did the Trial Court Commit Plain Error?

¶ 74          Defendant claims the trial court erred by proceeding with the sentencing hearing despite having received no report from Killian.

¶ 75          Defendant admits he did not raise this issue in either his posttrial motion or his postsentencing motion and that, under rules of procedural forfeiture, he consequently would be barred from raising the issue now. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010); *People v. Naylor*, 229 Ill. 2d 584, 592 (2008). He argues, however, that the doctrine of plain error (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)) averts the forfeiture, and in support of that argument, he cites *People v. Vernon*, 346 Ill. App. 3d 775, 777 (2004).

¶ 76          We do not find *Vernon* to be very convincing in its plain-error analysis, although, to be fair to the Third District, it did not have the benefit of the supreme court's decision in *People v. Herron*, 215 Ill. 2d 167 (2005), when it decided *Vernon*.

¶ 77          Let us begin our discussion of *Vernon* by identifying the issue in that case. The defendant argued that, by granting defense counsel's motion to appoint an expert to perform a fitness examination, the trial court had impliedly found a *bona fide* doubt as to the defendant's

fitness, obligating the court to follow through by holding a fitness hearing—something the court never did; and in fact (as in the present case), the record did not even include a report by the appointed expert. *Vernon*, 346 Ill. App. 3d at 777. The appellate court ultimately rejected that argument (*id.* at 779), which, incidentally, was untenable under the supreme court's recent decision in *People v. Hanson*, 212 Ill. 2d 212, 214-15 (2004) ("[T]he grant of a defense motion for a psychological examination, without more, [does not create] a sufficient inference that the trial court found *bona fide* doubt of [the] defendant's fitness to stand trial to require a remand for a retrospective fitness hearing."). But before reaching the merits of the defendant's argument, the appellate court had to decide whether the defendant could even make the argument on appeal after omitting to make the argument in the trial court.

¶ 78    The appellate court said:

> "We note that the defendant did not object to the court's
> failure to conduct a fitness hearing or raise the issue in his posttrial
> motion. While such issues are generally deemed [forfeited], an
> issue may be reviewed as plain error when it concerns a substantial
> right. *People v. Basler*, 193 Ill. 2d 545 *** (2000). The
> determination of a defendant's fitness to stand trial concerns a
> substantial right. *People v. Contorno*, 322 Ill. App. 3d 177 ***
> (2001). Plain error review is therefore appropriate." *Vernon*, 346
> Ill. App. 3d at 777.

¶ 79    In the paragraph quoted above, the appellate court used the phrase "concerns a substantial right," and, to be sure, Rule 615(a) says: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S.

Ct. R. 615(a) (eff. Jan. 1, 1967). From that language in Rule 615(a), however, case law has derived an analytical framework, which involves more than asking whether the alleged error "concerns a substantial right." The phrase "[p]lain errors or defects affecting substantial rights" has been interpreted and amplified. Most notably, the supreme court said in *Herron*:

> "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [*People v. Keene*, 169 Ill. 2d 1, 17 (1995).] Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) [*People v. Blue*, 189 Ill. 2d 99, 138 (2000)]. In both instances, the burden of persuasion remains with the defendant. See [*People v. Thurow*, 203 Ill. 2d 352, 363

(2003)]; see also [*People v. Hopp*, 209 Ill. 2d 1, 12 (2004)] (the plain-error rule requires the defendant to 'show that the error caused a *severe* threat to the fairness' of the trial (emphasis in original))." *Herron*, 215 Ill. 2d at 186-87.

¶ 80    Similarly, "[i]n the sentencing context, a defendant must *** show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545.

¶ 81    In the present case, when invoking the doctrine of plain error, defendant does not interact with this analytical framework; he does not specifically argue either (1) or (2) from *Herron* and *Hillier*. We assume he means to rely on (2), the second, alternative element of plain error. This second element can be further broken down into the following two propositions: (1) "a clear or obvious error occurred," and (2) the error "is so serious that it affected the fairness of the defendant's trial" (or sentencing hearing) "and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 82    First, then, we look for an error—and maybe "look for" is not the right way of putting it; the error has to just about leap off the pages of the record. Arguable error is not enough. Mere error is not enough. The error has to be "clear or obvious." *Id.* Otherwise, it would not be *plain* error.

¶ 83    Defendant argues that proceeding with the sentencing hearing in the absence of a report from Killian was plain error. His reasoning is essentially as follows. Section 104-15(a) of the Code says that if a trial court appoints an expert to evaluate the defendant's fitness (see 725 ILCS 5/104-13(a), (b) (West 2012)), the expert "*shall* submit a written report to the court, the

State, and the defense within 30 days of the date of the order." (Emphasis added.) (725 ILCS 5/104-16 (West 2012)). "Shall" is a verb of command, defendant notes, and he understands this command, in conjunction with the deadline, to signify that the filing of a report is indispensable to the further progress of the proceedings.

¶ 84 Actually, it is not quite as simple as that. Just because the legislature makes a command by using the word "shall" in a statute, it does not necessarily follow that the legislature intends noncompliance with the command to invalidate the governmental action to which the command relates. *In re M.I.*, 2013 IL 113776, ¶ 16; *Cebertowicz v. Madigan*, 2016 IL App (4th) 140917, ¶ 17. The "shall," though a command, could be "directory" rather than "mandatory"— meaning that, although the legislature intended there to be compliance, the legislature did not intend any particular consequence to follow from noncompliance. *M.I.*, 2013 IL 113776, ¶ 16.

¶ 85 Whether a statutory command is mandatory or directory is a question of legislative intent, and the best evidence of legislative intent is the statutory language, understood in its plain and ordinary sense. *Id.* ¶ 15; *Secretary of State v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 111075, ¶ 61. We call attention to some apropos language in section 104-11(b):

> "(b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. *However, no order entered pursuant to this subsection shall prevent further proceedings in the case.* An expert so appointed shall examine the defendant and make a report as provided in

Section 104-15. Upon the filing with the court of a verified statement of services rendered, the court shall enter an order on the county board to pay such expert a reasonable fee stated in the order." (Emphasis added.) 725 ILCS 5/104-11(b) (West 2012).

¶ 86 It was at the request of defense counsel that the trial court appointed Killian to examine defendant and determine, prior to sentencing, if a *bona fide* doubt as to his fitness to be sentenced might be raised. (Granted, section 104-11(b) says "prior to trial" (*id.*), but because "[t]he issue of the defendant's fitness *** to be sentenced" may also "be raised by the defense" (725 ILCS 5/104-11(a) (West 2012)), we interpret "prior to trial" as meaning also "prior to sentencing.") The court never found a *bona fide* doubt as to defendant's fitness, and defense counsel never claimed there was a *bona fide* doubt as to defendant's fitness; therefore, section 104-11(b) is the relevant statutory provision: the court appointed Killian, at defense counsel's request, to determine if a *bona fide* doubt as to defendant's fitness *might be raised*. True, section 104-11(b) commands that such an expert, appointed by the court, "shall examine the defendant and make a report," but in the preceding sentence, section 104-11(b) also commands: "However, no order entered pursuant to this subsection shall prevent further proceedings in the case." 725 ILCS 5/104-11(b) (West 2012).

¶ 87 Case law tells us to give effect to the plain meaning of that sentence, without imposing on it any exceptions or limitations lacking a basis in the statutory text. See *People v. Almond*, 2015 IL 113817, ¶ 42. Because the definition of a "proceeding" encompasses hearings (Black's Law Dictionary 1221 (7th ed. 1999)), a sentencing hearing is a "proceeding." It would seem, then, that if the trial court, on the motion of defense counsel, appoints an expert to perform a fitness examination, not because there is a *bona fide* doubt as to the defendant's fitness but just

to see if such a *bona fide* doubt might be raised, the order appointing the expert will not prevent a sentencing hearing from taking place. And it would seem that if the order will not prevent a sentencing hearing from taking place, that is just another way of saying that noncompliance or delayed compliance with the order will not do so. Now, we need not decide definitively if that is the correct interpretation or application of section 104-11(b). We should decide only what we have to decide (thus our tentative language). *Antonacci v. Seyfarth Shaw, LLP*, 2015 IL App (1st) 142372, ¶ 33. Suffice it to say that, given the sentence from section 104-11(b) we have pointed out ("[h]owever, no order entered pursuant to this subsection shall prevent further proceedings in the case" (725 ILCS 5/104-11(b) (West 2012)), we find no *clear or obvious* error in going ahead with the sentencing hearing despite the absence of a report by Killian. See *Walker*, 232 Ill. 2d at 124.

¶ 88    But defendant argues that, in the absence of a report by Killian, going ahead with the sentencing hearing violated *Drope v. Missouri*, 420 U.S. 162, 172 (1975), and *Pate v. Robinson*, 383 U.S. 375, 385 (1966), which he interprets as holding: "[A] defendant's due process rights are violated if the procedures set out to protect a defendant from being tried while unfit are not followed." Actually, that is too broad a statement of the holding in those cases. More precisely, those cases hold that *if the record raises a bona fide doubt of the defendant's fitness to stand trial*, the defendant must "receive an adequate hearing on his competence to stand trial." See *Pate*, 383 U.S. at 385; see also *Drope*, 420 U.S. at 181. Likewise, in another case that defendant cites, *People v. Harris*, 113 Ill. App. 3d 663 (1983), the appellate court held that *because the record raised a bona fide doubt of the defendant's fitness* (*id.* at 667), the trial court not only should have held a fitness hearing (*id.*), but it should have ensured that the psychiatric report met the requirements of section 104-15(a) (*id.* at 669). All those cases are distinguishable

because, in the present case, the record raises no *bona fide* doubt as to defendant's fitness. A diagnosis of bipolar disorder, by itself, does not call into question his competence to stand trial (or be sentenced) (see *People v. Eddmonds*, 143 Ill. 2d 501, 519 (1991)). As the supreme court has said:

> "The mere fact that the [defendant] suffers from mental disturbances or requires psychiatric treatment *** does not necessarily raise a *bona fide* doubt of his ability to consult with counsel. A defendant may be competent to participate at trial even though his mind is otherwise unsound. [Citations.] Fitness speaks only to a person's ability to function within the context of a trial; it does not refer to competence in other areas [Citation.]." *Id.* at 519-20.

¶ 89 In short, the record raises no *bona fide* doubt as to defendant's fitness, and failing to follow a procedure in article 104 of the Code (725 ILCS 5/104-10 to 104-31 (West 2012)) does not *necessarily* violate due process. Article 104 does not determine the requirements of due process. Constitutional due process stands above article 104. And the overarching standard of due process is violated if, "[o]nce facts are brought to the attention of the circuit court which raise a *bona fide* doubt of [the] defendant's fitness to stand trial," the court holds no fitness hearing. *Harris*, 113 Ill. App. 3d at 667. In that circumstance, due process would be violated not because section 104-11(a) (725 ILCS 5/104-11(a) (West 2012)) happens to require a hearing if there is a *bona fide* doubt of the defendant's fitness; rather, due process would be violated because trying an unfit defendant, or someone whose fitness is legitimately in doubt, is fundamentally unfair (*Drope*, 420 U.S. at 172-73), regardless of what statutory law requires.

- 26 -

¶ 90 Defendant cites no case holding that due process likewise is violated if, after appointing a psychiatrist to examine a defendant whose fitness is *not*, as of yet, in *bona fide* doubt, the court holds further proceedings when a report by the psychiatrist fails to materialize and when defense counsel—who requested the fitness examination in the first place—fails to object.

¶ 91 B. Is the Evidence Sufficient To Support the Conviction on Count II?

¶ 92 Whenever a defendant challenges the sufficiency of the evidence, we look at all the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could find the elements of the offense to be proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. Obviously, to perform that analysis, we must have a clear understanding of what the elements of the offense are, what are the propositions the State had to prove.

¶ 93 The State had to prove the propositions in the charge. Count II alleges: "[T]he defendant, a sex offender required to register under the *** Act, gave false information to the Bloomington Police Department by saying that he was living at 1212 N. Western Ave.[,] Bloomington, IL[,] when he was not living at that address ***." It is illegal for a sex offender to "knowingly or wilfully [give] material information required by this Article that is false." 730 ILCS 150/10(a) (West 2012). Section 3(a) of the Act provides: "A sex offender *** shall *** provide accurate information as required by the Department of State Police. Such information shall include a *** current address ***." 730 ILCS 150/3(a) (West 2012).

¶ 94 Thus, the State had to prove four propositions.

¶ 95 First, the State had to prove that defendant was required to register. That proposition is not in dispute.

¶ 96        Second, the State had to prove that the Department of State Police required defendant to disclose where he lived. Judging from the registration form, People's exhibit No. 1, the Department of State Police did require that information. It is an "ISP" form ("ISP 4-84 (05/12)"), and "ISP" presumably is an abbreviation of "Illinois State Police." One of the items of information in the form is "Resident Address." Thus, the second proposition has support in the evidence.

¶ 97        Third, the State had to prove that where defendant lived was material information. That proposition is not in dispute. The whole point of the Act is to keep track of sex offenders.

¶ 98        Fourth, the State had to prove that defendant knowingly or willfully gave false information by telling the Bloomington police, on April 25, 2013, that 1212 North Western Avenue was his "Resident Address." Let us break down this fourth element. The State had to prove that (a) 1212 North Western Avenue was in fact not his residential address on April 25, 2013, when he represented it was; and (b) he knew, at the time of the representation, that 1212 North Western was not his residential address. See 730 ILCS 150/10(a) (West 2012); 720 ILCS 5/4-5 (West 2012). Defendant argues that this fourth element is where the State's case falls down.

¶ 99        Granted, there is People's exhibit No. 2, in which Bruce Mitchell said that defendant "ha[d] never lived" at 1212 North Western Avenue. But is that really the issue: whether defendant, in common parlance, "lived" at 1212 North Western Avenue? The place where you "live" is your home, your *place of residence*. Section 3(a), however, specially defines that term, "place of residence," and the meaning that term has in section 3(a) differs from the meaning it has in common parlance. Section 3(a) provides as follows:

"(a) A sex offender *** shall *** register in person and provide accurate information as required by the Department of State Police. Such information shall include a *** current address ***. ***

* * *

*For purposes of this Article, the place of residence or temporary domicile is defined as any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year.* Any person required to register under this Article who lacks a fixed address or temporary domicile must notify, in person, the agency of jurisdiction of his or her last known address within 3 days after ceasing to have a fixed residence."

(Emphasis added.) 730 ILCS 150/3(a) (West 2012).

By telling the police that defendant "ha[d] never lived" at 1212 North Western Avenue, Bruce Mitchell did not necessarily deny that defendant had stayed there "for an aggregate period of [three] or more days during" 2013. *Id.* Surely, Bruce Mitchell used the word "lived" in its plain and ordinary sense, as meaning putting down roots.

¶ 100　　　　A dictionary is a good place in which to find the plain and ordinary meanings of words. *People v. Hill*, 409 Ill. App. 3d 451, 454 (2011). To "live" (used with an adverbial) means to "make one's *home* in a particular place or with a particular person." (Emphasis added.) New Oxford American Dictionary 997 (2001). "Home" in turn is defined as "the place where one lives permanently, esp[ecially] as a member of a family or household." *Id.* at 813. Thus, if defendant had stayed in the basement of 1212 North Western Avenue for an aggregate period of

only three days in 2013—say, on April 24, May 15, and June 5—he would have been, in common parlance, an occasional *guest* at 1212 North Western Avenue, but he would not have *lived* there in the sense of making 1212 North Western Avenue his home, the place where he lived permanently, as a member of the household. And yet, for purposes of section 3(a), with its special definition of "place of residence," defendant could have accurately represented, on April 25, 2013, that 1212 North Western Avenue was a "Resident Address."

¶ 101 In sum, then, because the record contains no evidence that the representation at issue in the registration form, "Resident Address[:] 1212 N[orth] Western St[reet]," was objectively false, *i.e.*, that he had *not* stayed at 1212 North Western Avenue for an aggregate period of three days in 2013, we reverse the conviction on count II of the indictment.

¶ 102 III. CONCLUSION

¶ 103 For the reasons stated, we affirm the trial court's judgment in part and reverse it in part: we affirm the conviction on count I but reverse the conviction on count II. We assess $50 in costs against defendant.

¶ 104 Affirmed in part and reversed in part.

¶ 105    JUSTICE HOLDER WHITE, concurring in part and dissenting in part:

¶ 106    I agree with the majority's decision with the exception of its analysis and resolution of defendant's insufficiency of the evidence claim regarding count II. As the appellate court, it is our duty to review defendant's challenge to the sufficiency of the evidence as to count II by considering the evidence in the light most favorable to the prosecution. Further, we must determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Houston*, 258 Ill. App. 3d 364, 367 (1994).

¶ 107    In this matter, People's exhibit No.1 showed that on April 25, 2013, defendant registered his residence as 1212 North Western Street. Additionally, the court admitted as evidence a written statement from the owner of 1212 North Western Street, Bruce Mitchell. Mitchell's statement indicated that on June 12, 2013, defendant was not living at 1212 North Western Street and had never lived there. During the bench trial, Mitchell testified and changed his story. In its role as the trier of fact, the trial court was free to accept or reject Mitchell's trial testimony. After all, determining the credibility of the witnesses and drawing reasonable inferences from the evidence are responsibilities of the trier of fact. *People v. Sutherland,* 223 Ill. 2d 187, 242 (2006). The trial court was rational in drawing from Mitchell's written statement the reasonable inference that defendant did not reside at the Western Street address "for an aggregate period of time of 3 or more days during any calendar year." 730 ILCS 150/3(a) (West 2012).

¶ 108    Defendant's conviction on count II should be upheld because the evidence, when considered in the light most favorable to the prosecution, was sufficient to allow the trial court to find the essential elements of the crime beyond a reasonable doubt. Therefore, I respectfully dissent.