NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180116-U

NO. 4-18-0116

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DEMETRIUS BELL, | ) | No. 17CF241 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) When the evidence is viewed in the light most favorable to the prosecution, a rational jury could find, beyond a reasonable doubt, the elements of the two offenses with which defendant was charged: aggravated domestic battery and possession of a stolen or converted motor vehicle.

(2) Defendant has forfeited his claim of error in the jury instructions, and the doctrine of plain error does not avert the forfeiture.

¶ 2    In the circuit court of Livingston County, a jury found defendant, Demetrius Bell, guilty of both counts of a criminal information. Specifically, the jury found him guilty of count I, aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)), for which the court sentenced him to 10 years' imprisonment, and the jury also found him guilty of count II, possession of a converted or stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)), for which the court imposed a concurrent 8-year term of imprisonment. Defendant appeals on two grounds.

¶ 3        First, he contends that the evidence is legally insufficient to support his conviction of either count I or count II. We disagree. When the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, the elements of both of the charged offenses.

¶ 4        Second, for the first time, on appeal, defendant criticizes the jury instructions. He claims they suffer from a substantial defect that rises to the level of plain error. We are unconvinced; we see no clear or obvious error in the jury instructions.

¶ 5        Therefore, we affirm the judgment.

¶ 6                                    I. BACKGROUND

¶ 7        The jury trial was held on October 16, 2017. The witnesses testified substantially as follows.

¶ 8                          A. The Testimony of Tiffany Washington

¶ 9        One morning in July 2017, before her shift began at Caterpillar (it was the second shift, 3 p.m. to 11 p.m.), Tiffany Washington resumed her task of moving into her new residence on West Madison Street in Pontiac, Illinois. "Had you borrowed your mother's car to do that?" the prosecutor asked Washington. "Yes," she answered. According to Washington, only she had been driving her mother's car that day—even though, Washington admitted, she lacked a driver's license.

¶ 10        Defendant, her then-boyfriend, who had a valid driver's license, was going to live with Washington on West Madison Street. He previously helped out by moving the heavy things, such as the couch and the television. But on the day in question, the day of the battery, he did not help. It was only Washington doing the unpacking that day.

¶ 11        Washington remembered that as she was carrying boxes into the residence and unpacking them, she saw defendant approaching on foot from Fell Park. She continued with the moving chores. She brought in a lamp and stood it by the front door. She brought in a box of pots and pans and set the box on the table. When she turned around, defendant was standing at the front door. Then it was just the two of them in the house. She walked past him and used the bathroom.

¶ 12        She remembered nothing further. The rest was a blank until she woke up in a hospital bed, with stapled lacerations on both sides of her face and on the back of her head.

¶ 13        The day before this unpacking day, Washington had an altercation with defendant because after working a 12-hour shift at Caterpillar, she was in no mood to have sex with him. She did not consider this to be much of an altercation. She declined to have sex, and he became angry—that was all. She "just really moved over it." By the next day, "it wasn't an issue for [her]."

¶ 14        Washington could not remember if, the day after their little spat, she and defendant talked. She just remembered that he was in the house with her as she was unpacking and that no one else was there. She did not remember if they said anything to one other. Nor did she remember being hit. She had difficulty remembering what happened to her that day. She still suffered from short-term memory loss.

¶ 15        Defense counsel asked Washington if she remembered telling Detective Henson in August 2017, after she was discharged from the hospital, that defendant had been the one driving because she, Washington, lacked a driver's license. Washington did not remember telling the detective that. Nor did she remember telling the detective that defendant had asked her to come to Peoria with him and that she had declined because she had to go to work.

¶ 16                        B. The Testimony of Brontia Benge

¶ 17        Brontia Benge lent her daughter Tiffany Washington her car, a 2011 Kia Soul, so that Washington could use the car to move her belongings to her new residence. The prosecutor asked Benge:

> "Q. Did you have occasion to borrow [*sic*] her your vehicle while she was moving into a new house?
>
> A. Yes."

¶ 18        When lending her car to Washington, however, Benge did so on the understanding that she, Benge, would be picked up from work at 3 p.m. Like Washington, Benge worked at Caterpillar, and she worked the first shift, 7 a.m. to 3 p.m. Until Benge's shift ended, Washington had permission to use the car to move her belongings from her old residence in Pontiac to her new residence in Pontiac. And that was it. Benge denied giving anyone permission on July 31, 2017, to take her car outside Pontiac.

¶ 19        It was true that on a previous occasion Benge gave defendant permission to drive her car outside Pontiac to see his probation officer. That permission was limited, though, to that one time. A new out-of-town trip would have required new permission. The prosecutor asked Benge: "Did he have an open invitation to use your car freely?" "No," Benge answered. "Not whenever he wanted. He had to have permission."

¶ 20        Defense counsel asked Benge:

> "Q. The, your car, was [defendant] supposed to be driving the car that day to help your daughter move?
>
> A. He was to help her move. Yes.
>
> Q. And he had been driving the car other days to help her move. Is that correct?

A. Yes.

Q. And you allowed him to drive it frequently[,] the understanding being that he would pick you up from work. Is that correct?

A. I wouldn't say frequently; but yes, he did drive the car.

Q. Okay.

A. And yes, with the understanding of picking me up from work."

¶ 21 At 3 p.m. on July 31, 2017, Benge exited Caterpillar, and no one was there to pick her up. After waiting 15 minutes, she telephoned Washington's number and defendant's number. No one answered. So, Benge walked home. From home, she called a cab to take her to Washington's new house.

¶ 22 When Benge arrived there, the car was not in the driveway. Benge knocked on the front door. No one answered at first. The door was locked. Benge went around to a window, and then Washington opened the door. Benge went in. Blood was all over the floor, a lamp lay in the blood, and Washington was holding a rag to her head. Washington went into the bathroom and began throwing up. Then she gazed at herself in the mirror. After mopping up some of the blood with towels and setting the lamp on a stand near the front door, Benge went to check on Washington. She had some bad cuts on her face and her head, and one of the cuts was deep enough that Benge could have laid her finger in it. Benge called her other daughter to come and take them to the hospital.

¶ 23 Benge did not hear from defendant that day until about 10:35 or 10:40 p.m. Defendant called Benge from Peoria and asked her where she was. Benge told him not to worry where she was. Defendant did not tell her he was returning with her car. Benge gave the police the Peoria telephone number from which defendant had called.

¶ 24                                C. The Testimony of Derek Schumm

¶ 25          On July 31, 2017, a Pontiac police officer, Derek Schumm, went to see Washington in the hospital in Pontiac. She had lacerations to her forehead and to the left and right sides of her head. Schumm photographed her injuries, and in the trial the photographs were admitted in evidence. Washington was speaking coherently in the hospital, but she did not have a good memory of what had happened.

¶ 26          After interviewing her in the hospital, Schumm went to Washington's residence. Given what he had been told at the hospital, Schumm was scarcely surprised by what he saw. An abundance of blood was spattered on the living room floor. A dented lamp stood on a shelf next to the front door, and the pole of the lamp was bloody. Again, Schumm took photographs, which were admitted in evidence in the trial and published to the jury.

¶ 27                                D. The Testimony of Johnathan Marion

¶ 28          On July 31, 2017, Johnathan Marion, a Pontiac police officer, pulled over a red Kia Soul, driven by defendant, because the car had been reported stolen. Marion's squad car was equipped with a camcorder, which recorded the traffic stop and the arrest of defendant. The video and audio recording was admitted in evidence and played to the jury.

¶ 29          The footage on the compact disc shows Marion pulling over the Kia. It is nighttime. A voice orders defendant to turn off the engine, throw the car keys out the window, come out of the car with his hands raised, and kneel down on the street. He does all that. After defendant is handcuffed, assisted to his feet, and brought over to the front of the squad car, a police officer begins removing the tennis shoes from defendant's feet. As defendant is standing on his right foot while the shoe is removed from his left foot, a police officer holds lightly onto defendant's right arm to steady him. Defendant has a short conversation with this police officer on his right. A few

of the words in the audio are difficult to make out, but here is what defendant and the police officer seem to be saying in this brief back-and-forth. Defendant asks the police officer, "Is she okay?" After a pause, the officer appears to realize that defendant was talking to him and asks, "What's that?" "Sayin' is my girlfriend okay?" defendant asks. The officer responds, "We'll talk in a little bit, all right?" Defendant then immediately says, "It more to the story. I know how it may look, but it's always two sides to the story."

¶ 30                    E. The Testimony of Michael Henson

¶ 31        In July 2017, a detective of the Pontiac Police Department, Michael Henson, investigated the battery perpetrated on Washington. In his investigation, Henson took photographs of defendant's tennis shoes and of bloody shoe prints left on the hardwood floor of Washington's living room. The photographs were admitted in evidence and published to the jury.

¶ 32        In photographs of one of defendant's shoes, a red blood-like substance appears to have dried on a white plastic or rubber strip on the side and back of the shoe. Also, Henson took a photograph of the underside, the sole, of defendant's shoe. The sole has built into it several ovals or islands of chevrons or zigzag indentations. When the photograph of the sole is compared with a photograph of the bloody shoe print on Washington's floor, the patterns appear to match. The distinctive patterns of the sole are traced in blood on the varnished wooden floor.

¶ 33        Henson also compared text messages: those stored in a white cell phone left in Washington's bathroom and those stored on Washington's cell phone. The text messages matched. Defendant admitted that this white cell phone, smeared on the back with a red blood-like substance, belonged to him. He and Henson looked through the white cell phone together, and Henson took photographs of the text conversation therein. Judging by the matching text messages in Washington's cell phone, it was a conversation that defendant had with Washington on July 31,

2017—the day of the battery—from 12:10 p.m. to 1 p.m. (Those are the date and times at the top and bottom of the scrolling text conversation.)

¶ 34        In one of the messages making up this text conversation, Washington writes to defendant: "[I] didn't have sex with you and now all of the sudden the world coming to an end in Dutch's world maybe you need to call your dad and ask your dad where you coming." Defendant responds: "Just get your house together when u go to work i wont even be in pontiac." Washington observes that they "don't have arguments about real issues" but that, instead, they "have arguments about me not having sex with you one night." She complains that while she is busy getting the utilities and internet switched over, all defendant can think about is himself, Dutch. "[I]t's all about Dutch when is it going to be about us an r happiness?" she inquires. Defendant writes: "Im done [with] this is my final text yes im sitting at the park but not for long once that ride comes im gone and u think im playing i told u you will respect me." Washington replies: "Okay like I said I knew this was going to happen and I meant everything I said the other day so I hope you have a blessed life I hope you make some woman very happy ***." Washington continues: "And go ahead and say all the disrespectful things you want to say to me all the crazy shit you're going to say like I've been cheating on you I've been doing this and doing that [the] whole time I've been faithful ***." Defendant reproaches Washington for being merely his "girlfriend" instead of his "wife." A wife, he asserts, would "drop anything she doin to please [him]." He warns that his ride is 25 minutes away and adds that Washington should be happy she "wont have to worry about me begging no moe." "Okay have a good life Dutch," Washington quips.

¶ 35        On cross-examination, Henson testified that on or about August 22, 2017, he interviewed Washington. He believed that, in the interview, she told him that defendant had asked her to go to Peoria with him but that she had declined because she had to go to work.

¶ 36                                    F. The Testimony of Defendant

¶ 37          The State rested, and defendant chose to testify in his own behalf, a choice he confirmed after being admonished by the circuit court. According to defendant's testimony, he was 33 years old, and he and Washington had been in a relationship since August 17, 2016. They had been living together since May 12, 2017, ever since defendant was paroled after serving his prison sentence for unlawful use of a weapon. Upon his release, his home address of record, for purposes of parole, was Washington's apartment on West Prairie Street in Pontiac.

¶ 38          The two of them then moved to the house on West Madison Street. On July 31, 2017, they had everything moved from the previous residence, and only the unpacking remained to be done. Defendant had moved all the heavy things, such as the couch and the stove, and he was in the bedroom lying down as Washington was unpacking the household goods and dealing with the landlady.

¶ 39          The day before, on July 30, 2017, defendant and Washington got into "an argument about sex." "[I]t wasn't that she was working hours and hours and that she was tired," defendant explained. "That wasn't really the nature of the argument. You know what I mean? It was about what she was telling me when I was locked up compared to what she done when I got out." The text messages photographed by Henson captured the "majority" of the argument.

¶ 40          Defendant and Washington were texting one another instead of talking face to face because defendant was at Fell Park at the time on July 31, 2017—where he was accustomed to go every day. From the park, he returned home, that is, to their new home on West Madison Street. Initially, he had told Washington he "was going to have somebody come pick [him] up from the park so [he could] get a ride and just get away from [Washington] to cool off and all that type of stuff." But he "eventually ended up going back home," where, according to defendant, he and

Washington "worked things out." They "coincided," as he put it. They resolved to "stop letting small stuff interfere with [their] love."

¶ 41 Defendant suggested to Washington that the two of them take her mother's car to Peoria so that Washington could meet his children—which Washington had been wanting to do. "We [could] get there and come back before we go pick her mother up from work that day, and we had plenty of time," defendant testified. Washington "declined because she wanted to finish unpacking in the house[,] plus she had to work." So, defendant left by himself in Benge's car, which was parked in the driveway of the West Madison Street house.

¶ 42 Defense counsel asked defendant:

"Q. Now, what time of day—Do you recall what time it was or what time of day that you left the house to go to Peoria?

A. It's been awhile. I can't give you the exact day. I don't want to be lying on the record; but somewhere probably around 12:45, 1:00, something like that to sum it up. You know what I mean?

Q. Someplace after lunchtime?

A. Yeah."

¶ 43 When defendant set out for Peoria in Benge's car, Washington was sitting in the living room, "fine" and "in a good mood." He was about 20 minutes outside Pontiac when he realized he had left his cell phone in the bedroom of Washington's house. "So once [he] made it to Peoria[,] [he] instantly started calling their phones and stuff like that[,] letting them know to call the other one." Contrary to Benge's testimony, defendant telephoned Benge not once but twice on July 31, 2017. He made the earlier call to Benge from his daughter's grandmother's house in Peoria. Later, at 10:30 p.m., he made the second call to Benge, "[t]o apologize for not going to get

- 10 -

her from work, you know what I mean, because I know she got off at 3:00 that night. That was the part to tell her[,] [']I'm sorry for not being able to pick you up from work[,'] and stuff like that." Defense counsel asked defendant: "And when you got to Peoria, you tried to call [Washington] to let her know you were okay." Defendant answered:

"A. From my stepfather's house. That was the first stop I made when I got to town.

Q. But she did not pick up?

A. No. Because it kept going to voicemail."

¶ 44 Defense counsel asked defendant why, in the video of his arrest, he asked a police officer, " [']I]s my girlfriend okay?['] " Defendant answered:

"A. If you play the video back, you can hear like officers speaking on the side because there was like four other officers present on the side because there was other trucks and cars behind the car that had me on dashboard camera. And I asked them[,] ['W]hat is it about[?'] He said my girlfriend's been injured, and I asked the one that had arrested me[,] [']I]s my girlfriend okay[?'] because they was on the side talking. You couldn't really hear them that good, but you could hear us conversate. Couldn't hear what was said real clearly but they tell me, I'm like[,] ['W]hat this about[?'] They said, [']Y]our girlfriend's been injured.['] I said, [']I]s she okay[?'] Says[,] ['M]y girlfriend okay[?'] That's what I asked him."

¶ 45 Defendant denied inflicting the head wounds on Washington. The lamp, he claimed, already was dented—and for that reason, he and Washington had intended to throw it away. He testified that the clothing he was wearing at the time of his arrest was the same clothing he was wearing when he left Washington's house. And yet the police did not collect his clothing.

¶ 46        As for the bloody shoe print, defendant denied it was his:

"THE WITNESS: No, sir. That would not be my shoe print on that floor right there.

MR. MASON [(DEFENSE COUNSEL)]: Q. Now Detective Henson took that and compared your, and took your shoes believing them to have made the shoe print. Are there any other shoes that could have made that print?

A. Yes, there is, sir.

Q. What shoes are those?

A. Well, actually those are, those are Michael Jordan tennis shoes right there. Me and Tiffany—

Q. The ones on the—

A. On the exhibit picture right there with the blood on it. Me and Tiffany Washington, we have the same exact shoes. She wore them today to court. We got them on date night. We went and bought shoes from Bloomington at the mall. We both dressed up for date day. You know what I'm saying? And we had the same exact tennis shoes. We wear the same act size and everything."

¶ 47        In fact, at the end of June 2017 or in early July 2017, defendant and Washington took Benge's car to Bloomington, Illinois—with Benge's permission—to buy these matching pairs of tennis shoes. Defendant used to drive Benge's car almost every day. He routinely drove Benge and Washington to work at Caterpillar and then drove himself to work at Exact Packaging, Inc., and Interlake Warehouse Solutions. Also, there were times when, with Benge's permission, he drove her car outside Pontiac:

"A. I drove to Bloomington, Illinois, to do a urine drop for my federal probation because they didn't have it down here in Pontiac so I had to drive to Bloomington to do my urine drops. And I drove to Peoria, Illinois, to the federal courthouse to actually meet my federal probation officer.

Q. Did you get permission from Ms. Benge for these various drives?

A. Yes, sir, I have."

¶ 48    After defendant testified, the defense rested. The State had no rebuttal evidence.

¶ 49    G. The Jury Instruction Conference

¶ 50    Earlier in the trial, after the State finished its case in chief and before the defense began its case, the circuit court excused the jury for lunch and held a jury instruction conference. In this conference, the defense tendered no jury instructions and made no objection to the jury instructions that the State tendered. The court accepted all of the State's jury instructions.

¶ 51    The jury was given, among other instructions, modified Illinois Pattern Jury Instructions, Criminal, Nos. 23.35, 23.35A, and 23.36 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 23.35; IPI Criminal No. 23.35A; and IPI Criminal No. 23.36), as tendered by the State. Under these instructions, the jury could find that defendant had "converted" Benge's car only if the evidence proved that Benge had been "wrongfully deprived" of her car.

¶ 52    Specifically, modified IPI Criminal No. 23.35 stated:

"A person commits the offense of possession of a converted vehicle when that person possesses a vehicle when not entitled to possession of the vehicle and that person wrongfully deprived the owner of the vehicle."

¶ 53    Modified IPI Criminal No. 23.35A stated:

"Property has been 'converted' if a person lawfully entitled to possession of that property has been wrongfully deprived of it."

¶ 54        Finally, modified IPI Criminal No. 23.36, an issues instruction, read as follows:

"To sustain the charge of possession of a converted vehicle, the State must prove the following propositions:

*First Proposition*: That the defendant possessed a vehicle belonging to Brontia Benge and;

*Second Proposition*: That the defendant was not entitled to possession of the vehicle; and

*Third Proposition*: That the defendant wrongfully deprived Brontia Benge of the vehicle.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphases in original.)

¶ 55        The jury instructions did not define the phrase "wrongfully deprived."

¶ 56                              II. ANALYSIS

¶ 57                        A. The Sufficiency of the Evidence

¶ 58                            1. *Aggravated Domestic Battery*

¶ 59        Defendant contends that the evidence in the jury trial was insufficient to support his conviction of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)). The statute

- 14 -

defining that offense provides as follows: "A person who, in committing a domestic battery, knowingly causes great bodily harm *** commits aggravated domestic battery." *Id.* So, to commit aggravated domestic battery, one must commit domestic battery. Domestic battery is the act of knowingly and without legal justification causing bodily harm to a family or household member (*id.* § 12-3.2(a)(1)) or making physical contact of an insulting or provoking nature with a family or household member (*id.* § 12-3.2(a)(2)). Defendant does not dispute that Washington was, to him, a family or household member (see *id.* §§ 12.01, 12-3.2(a)(1), (2)). Nor does he dispute that she suffered great bodily harm (see *id.* § 12-3.3(a)). Nevertheless, defendant regards the evidence as legally insufficient to prove that *he* was the one who caused her the great bodily harm (see *id.*).

¶ 60        In making this attack on the sufficiency of the evidence, defendant acknowledges the deference we owe to the jury insomuch as the jury made factual findings that are reasonably defensible. Instead of retrying defendant, we should view the evidence in the light most favorable to the prosecution and ask whether *any* rational trier of fact could have found the elements of the offense to be proven beyond a reasonable doubt—including the element that defendant was the one who battered Washington. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Defendant argues that, even when the evidence is viewed in the light most favorable to the prosecution (as the evidence must be viewed), no rational trier of fact could find defendant to be the assailant. Defendant gives essentially three reasons for this argument.

¶ 61        First, defendant considers the State's theory of motive to have been seriously undermined by Washington's testimony. The State's theory was that defendant battered Washington because they got into an argument over her refusal to have sex with him the previous day and the argument got out of control. Defendant points out, however, that the argument was no

- 15 -

big deal to Washington. By the next day, as she was unpacking household goods, the argument of the day before "wasn't an issue for [her]."

¶ 62    But the argument was enough of an issue for defendant that, on the day of the battery, July 31, 2017, he threatened to leave for good. An argument over a relatively trivial matter can morph into an argument over weightier matters. Judging by their text conversation, that is what happened in the argument that defendant and Washington had shortly before Washington was battered. Originally, it was merely an argument over a partner's being too tired to have sex after work. It became an argument about selfishness, responsibility, maturity, faithfulness, and respect. In one of his text messages, defendant writes to Washington ominously, "[You] think [I'm] playing[;] [I] told [you that] you will respect me." He had reason to feel disrespected when Washington called his bluff, telling him with contemptuous indifference, " 'Okay[,] have a good life[,] Dutch.' " Defendant, by his own admission, needed to go for a ride and "cool off." But, apparently, the ride never came, and the jury may well have inferred that defendant came home from the park without the needed cooling-off period. Washington may have already cooled off— whether defendant stayed or left mattered little to her, if her text messages are to be believed—but defendant, perhaps, was still boiling.

¶ 63    Second, defendant notes the lack of any scientific evidence that there was blood on his shoes or that the bloody shoe prints in the living room were his. In his testimony, though, defendant admitted that the dried red liquid on his shoe was blood. He referred to the "Michael Jordan tennis shoes right there," the ones "[o]n the exhibit picture right there *with the blood on it*." (Emphasis added.) This admission was incidental to defendant's suggestion that Washington, rather than he, made the bloody shoe prints. Defendant explained that he and Washington owned the same brand of Michael Jordan shoes and that their respective pairs of shoes were identical,

- 16 -

right down to the shoe size. That explanation is not without its downside. As the State notes, that explanation amounts to a further admission that defendant's own shoes (identical in all respects to Washington's shoes) *could* have made the bloody shoe print. And, arguably, defendant's shoes *did* make the bloody shoe print, for, by his own admission, his shoes had blood on them. Where did the blood come from if not from Washington?

¶ 64          What is also problematic for the defense, the patterns do in fact match. Laypersons are perfectly capable of seeing that when the photograph of the bottom of defendant's shoe is set alongside the photograph of the bloody shoe print. It is as easy as comparing a rubber stamp to an ink impression. No scientist was required.

¶ 65          Third, although when he was arrested, defendant asked the police officer, "[I]is my girlfriend okay?" defendant, in his testimony, explained why he asked that question. The question, he testified, was not spontaneous; rather, he asked the question after hearing one police officer remark to another police officer that defendant's girlfriend had "been injured."

¶ 66          This explanation has some plausibility. Viewing the footage from the camcorder, one might infer that the police officers at the scene of the arrest had been informed of the attack upon Washington, for in response to defendant's inquiry about his girlfriend's welfare, the police officer tells him, "We'll talk in a little bit, all right?" So, defendant's question "[I]s my girlfriend okay?" might be susceptible to an innocent explanation. What is less easily explained, though, is the comment defendant made immediately after the police officer told him, "We'll talk in a little bit, all right?" Defendant pleaded, "It more to the story. I know how it may look, but it's always two sides to the story." This plea lends itself to an incriminating inference: defendant knew it looked bad for him because he knew *how* Washington had been injured—she had been badly

beaten—and he knew how Washington had been injured because he was the one who had administered the beating.

¶ 67    An argument might be made that when defendant said there were always two sides to the story, he was referring not to Washington's injuries but, rather, to his possession of Benge's car. That argument would not necessarily convince a reasonable trier of fact, considering that the conversation was about the injuries to defendant's girlfriend.

¶ 68    This is not to deny that reasonable arguments can be made for the defense. For one thing, if, as the State argues, defendant intended to flee in Benge's car, it is unclear why he would afterward telephone Benge and bring her car back to Pontiac. (We assume he brought her car back to Pontiac, since the Pontiac police arrested him.) Also, it might seem unlikely that if defendant were infuriated with Washington when he came home from the park, he would have asked her to come to Peoria with him to meet his children. We are supposed to look at the evidence, though, in the light most favorable to the prosecution (see *Collins*, 106 Ill. 2d at 261), and maybe defendant initially intended to flee, but he returned to Pontiac because he realized he had nowhere else to go. And maybe Washington's refusal to go with him to Peoria added to his frustration and set him off, like an attempt at reconciliation that misfired.

¶ 69    Under the circumstances, the trip to Peoria was suspicious. It made no sense. Arguably, it is unbelievable that Washington would have been sitting in the living room, "fine" and "in a good mood," as she watched defendant, at 1 p.m., take off for Peoria in her mother's car. Washington and defendant knew that Benge had to be picked up from work at 3 p.m. and that Washington had to be at work at 3 p.m.—and it was more than an hour's drive from Pontiac to Peoria. Thus, the drive to Peoria could look, to a reasonable trier of fact, as an impulsive flight

from which defendant later relented. Flight shows a consciousness of guilt. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 77.

¶ 70    Our point in offering these possible inferences and explanations is that the unanswered questions in the State's case do not create reasonable doubt as a matter of law. When the evidence is viewed in the light most favorable to the prosecution, a rational trier of fact could find, beyond a reasonable doubt, the elements of aggravated domestic battery. See *Collins*, 106 Ill. 2d at 261.

¶ 71    2. *Possession of a Stolen Motor Vehicle*

¶ 72    In defendant's view, the evidence likewise is legally insufficient to support his conviction of possessing a stolen or converted motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)). The unproven element, he maintains, is his knowledge that he lacked permission to possess Benge's car on July 31, 2017, when he drove it to Peoria. To commit the offense of possessing a converted motor vehicle, the person in possession of the motor vehicle must lack a right to possess it and must know that the vehicle has been converted. See *id.* The statute defining the offense provides as follows:

> "(a) *** [I]t is a violation of this Chapter for:
>
> (1) A person not entitled to the possession of a vehicle *** to *** possess *** it, knowing it to have been *** converted; additionally the General Assembly finds that the acquisition and disposition of vehicles *** [is] strictly controlled by law and that such acquisitions and dispositions are reflected by documents of title, uniform invoices, rental contracts, leasing agreements and bills of sale. It may be inferred, therefore that a person exercising exclusive unexplained possession over a *** converted vehicle

- 19 -

or an essential part of a stolen or converted vehicle has knowledge that such

vehicle \*\*\* is \*\*\* converted \*\*\*." *Id.*

As the jury instructions explained, "[p]roperty has been 'converted' if a person lawfully entitled

to possession of that property has been wrongfully deprived of it." See *People v. Washington*, 184

Ill. App. 3d 703, 709 (1989); *Yardley v. Yardley*, 137 Ill. App. 3d 747, 757 (1985).

¶ 73      The person lawfully entitled to possession of Benge's car the afternoon of July 31,

2017, was Washington or Benge, not defendant. Benge testified that she lent the car that day to

Washington, not defendant. It is true that Benge answered yes to the question of whether

"[defendant was] supposed to be driving the car that day to help [Washington] move." Both

Washington and defendant testified, however, that defendant did not help with the moving on July

31, 2017, and Benge denied that defendant had "an open invitation to use [her] car freely."

According to Benge's testimony, which the jury was free to believe (see *Collins*, 106 Ill. 2d at 261-

62), defendant could not use Benge's car "whenever he wanted"; instead, "[h]e had to have

permission." Benge denied giving defendant permission to drive her car to Peoria on July 31, 2017.

It is unlikely that Washington gave him permission to do so, since, as Washington and defendant

well knew, Benge had to be picked up from work in that car at 3 p.m., which was only a couple of

hours away.

¶ 74      Thus, when the evidence is viewed in the light most favorable to the prosecution, a

rational trier of fact could find, beyond a reasonable doubt, that (1) defendant lacked permission

to take possession of Benge's car on July 31, 2017, and drive it to Peoria and (2) he knew he lacked

such permission. See *id.* at 261.

¶ 75      B. Defendant's Belated Challenge to the Jury Instructions

¶ 76        Defendant complains that the jury instructions misled the jury and made his trial unfair by allowing the jury to find him guilty of possessing a converted motor vehicle even though his alleged conversion of Benge's car was only temporary. He argues it was not enough for the circuit court to instruct the jury that converting property meant wrongfully depriving someone of the property who was lawfully entitled to possess it. In addition, according to defendant, the court should have instructed the jury that such a deprivation had to be "significant." Defendant proposes if not a reversal on the ground of the insufficiency of evidence, at least a new trial with different jury instructions. He proposes modifying IPI Criminal, No. 23.35A as follows (with his suggested modifications emphasized): "*A motor vehicle* has been 'converted' if a person lawfully entitled to possession of that property has been wrongfully, *and significantly*, deprived *of its use*." Similarly, in defendant's view, the jury instructions should have defined the phrase "wrongfully deprived" as "a significant deprivation of the vehicle owner's possession and use of the vehicle."

¶ 77        Defendant admits that, in the jury instruction conference, he neither objected to the jury instructions the State tendered nor tendered any alternative jury instructions of his own. He acknowledges that such omissions, along with a failure to raise the issue in his posttrial motion, normally result in a forfeiture of the issue. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Anderson*, 325 Ill. App. 3d 624, 636 (2001). Defendant maintains, however, that the evidence in the jury trial was closely balanced, the instructional error was substantial, and the plain-error doctrine therefore should avert the forfeiture. See Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013); *People v. Herron*, 215 Ill. 2d 167, 175, 178-79 (2005).

¶ 78        The first question in plain-error review is whether "a clear or obvious error occurred." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Arguable error is not enough; the error must be clear or obvious. *People v. Manskey*, 2016 IL App (4th) 140440, ¶ 82. Was it a clear

or obvious error to instruct the jury: "Property has been 'converted' if a person lawfully entitled to possession of that property has been wrongfully deprived of it"? Section 4-103(a)(1) of the Illinois Vehicle Code (625 ILCS 5/4-103(a)(1) (West 2016)) uses the word "converted" without defining the word. Absent a special definition, we give the words in a statute their ordinary meaning. *Gekas v. Williamson*, 393 Ill. App. 3d 573, 579 (2009). The ordinary meanings of words can be found in a dictionary. *People v. Cardamone*, 232 Ill. 2d 504, 513 (2009). A dictionary defines "conversion" as "the action of wrongfully dealing with goods in a manner inconsistent with the owner's rights." The New Oxford American Dictionary 376 (2001). Similarly, case law teaches: "The essence of conversion is the wrongful deprivation of property from one who has a right to its immediate possession." *Yardley*, 137 Ill. App. 3d at 757. The case that *Yardley* cites, *Bender v. Consolidated Mink Ranch, Inc.*, 110 Ill. App. 3d 207, 213 (1982), says the same thing. The definitional jury instruction the circuit court gave tracks the language of *Yardley* and *Bender* pretty closely. To wrongfully deprive Benge of her car was to wrongfully deal with her car in a manner inconsistent with her rights. See New Oxford American Dictionary 376 (2001). Thus, we see no clear or obvious instructional error, and the procedural forfeiture will stand. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 79　　　　Defendant argues that if we find, as the State claims, that he is estopped from raising his claim of instructional error, we should find that his trial counsel rendered ineffective assistance by failing to object to the jury instructions. We disagree with the State that defendant is *estopped* from raising his claim of instructional error; defendant merely has *forfeited* the claim. See *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44 (explaining the difference between estoppel and procedural forfeiture). Thus, we do not reach defendant's claim of ineffective assistance.

¶ 80　　　　　　　　　　　　III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 82    Affirmed.